**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BENNETT KIGHT,<br><br>Defendant. | Case No. 1:16-CR-0099-WSD-LTW |

**DEFENDANT BENNETT KIGHT'S MOTION TO STAY PROCEEDINGS TO DETERMINE COMPETENCY**

DENTONS US LLP

Barry J. Armstrong
Georgia Bar No. 022055
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308-3265
Telephone: (404)527-4372
Email:barry.armstrong@dentons.com

Rachel M. Cannon, ARDC No. 6257028
233 South Wacker Drive
Suite 5900
Chicago, Illinois 60606
Telephone: (312) 876-2474
Email: rachel.cannon@dentons.com
***Attorneys for Defendant***

## I. Introduction

Defendant Bennett Kight is 76 years' old. In January 2008, he suffered a major brain hematoma (i.e. a brain hemorrhage, or bleeding in his brain). Since then, Defendant's mental capacity has declined progressively to the point where he has now been diagnosed with dementia by Dr. Angela Ashley, the Director of the Memory Assessment Clinic at Grady Memorial Hospital and an Assistant Professor in the Department of Neurology at Emory University School of Medicine.

Since being diagnosed with dementia, on December 22, 2016, Defendant suffered another brain hematoma and 3 broken ribs when he fell while walking his dog. Then, on February 6, 2017, Defendant suffered a seizure that required his admission to the emergency room. He has also been suffering from aphasia. *See* Exhibit D. As the Government has noted, aphasia is "an impairment of language, affecting the production or comprehension of speech and the ability to read or write." ECF No. 58 at 4 n.2 (citing www.aphasia.org).[1]

---

[1] On February 14, 2017, Defendant requested oral argument on the Government's disqualification motion. ECF No. 55. Defendant did so in order to be able to "apprise the Court" *at oral argument* about recent medical events Defendant had suffered. *Id*. at 1. Like all patients, Defendant is not able to receive his medical records immediately upon leaving his doctors' appointments or hospitalizations. Thus, despite the Government's claim that Defendant has not

As a result of Defendant's mental health issues, he is no longer competent to understand the nature and consequences of the proceedings against him, or to assist properly in his defense. Accordingly, Defendant is respectfully requesting that the Court stay the proceedings to permit a competency determination.

## II. Factual Background

### A. Dr. Jason King's Evaluation

In June of 2016, Mr. Kight submitted to a neuropsychological evaluation with Dr. Jason King, a board-certified neuropsychologist and psychologist.[2] *See* Exhibit A at 2, KIGHT000001-13. A neuropsychological evaluation is a procedure used to assess brain functioning. It consists of a detailed diagnostic patient interview, a review of available medical records, and the administration of a battery of neuropsychological and functional ability tests. Ex. A at 2.

---

suffered from delirium or aphasia, *see* ECF No. 58, as Exhibit D reflects, he indeed has.

[2] As Dr. King's curriculum vitae reflects (Ex. A at KIGHT000014-18), he received his B.S. in Psychology from Pennsylvania State University in 1997; his M.S. in Psychology from Nova Southeastern University in 1999; and his PhD in Clinical Psychology (with a Neuropsychology concentration) from Nova Southeastern University in 2004. Dr. King completed an Internship in Clinical Psychology and Neuropsychology at the Baylor College of Medicine from 2002-2003, and completed a Post-Doctoral Fellowship in Clinical Neuropsychology at the Emory University School of Medicine from 2003-2005. He now provides professional neuropsychological and psychological services to individuals and organizations.

The neuropsychological tests administered during a neuropsychological exam are specifically designed to detect and quantify the behavioral effects of brain dysfunction. *Id.* Such tests offer a standardized and objective method of measuring an individual's reasoning abilities, memory, and other brain-based cognitive abilities. *Id.* Following the administration of neuropsychological tests, an examinee's performance is compared to a large set of normative data gathered from the general population of neurologically intact persons. *Id.* In the case of deficient or impaired performances, it is possible to quantify the examinee's performance as mildly, moderately, or severely impaired based upon a numerical value representing the degree to which the examinee's score departs from the average for his or her same-age peers. *Id.* All of the test instruments used in Dr. King's evaluation have been validated and subject to publication and peer review, have known or potential error rates, and are generally accepted in the appropriate scientific literature. *Id.*

Following his June 1, 2016 examination, Dr. King concluded Mr. Kight suffered from Mild Cognitive Impairment [MCI], multiple domains. *Id.* at 4, KIGHT000007. Notably, Dr. King concluded that Mr. Kight's "current level of deficient cognitive functioning is at the more severe end of the range that would be classified as MCI, and if he were to experience any further cognitive decline, he

would be better classified as experiencing mild stage dementia." *Id.*

As Dr. King's evaluation notes, "[t]he medical records reviewed . . . document that the examinee experienced a very serious neurological event in January 2008, consisting of a blood vessel in his brain rupturing (hemorrhage). The ruptured blood vessel caused bleeding into his brain and formation of a blood clot (hematoma) in his brain and in the space between his brain and skull." *Id.* at 5, KIGHT000008; *see also id.* at KIGHT00026-78. As Dr. King further explained, although Mr. Kight initially improved following his hematoma,

> [H]e subsequently experienced a gradual decline in his cognitive functioning, including memory, ability to think and reason clearly, ability to multitask, and ability to comprehend complex information, over the course of the following eight years until the time of the present evaluation. The results from the cognitive testing conducted as part of the present evaluation indicate that he is currently experiencing significant cognitive impairment, near the margin between the diagnostic categories of Mild Cognitive Impairment and Dementia. His cognitive impairment would be expected to substantially affect his ability to understand the complex legal situation in which he is currently involved. I reviewed numerous legal documents[] and emails that illustrate the high degree of complexity of the financial and real estate transactions in question in the current legal dispute. In my professional opinion, Mr. Kight's cognitive impairment as documented in the current test results would result in a greatly reduced ability to understand, appreciate, and keep track of these types of complex financial and real estate transactions. Considering all of the available information, it is more likely than not that Mr. Kight has experienced some degree of clinically significant cognitive impairment continuously since the time that the brain hemorrhage was initially recognized in January 2008. Although he

> showed initial improvement in his cognitive functioning during the weeks following his brain hemorrhage, he has subsequently experienced ongoing gradual decline in his cognitive abilities over time.

*Id.* at 5, KIGHT000008-09.

Dr. King concluded that Mr. Kight "should have an evaluation with a neurologist for further assessment regarding the etiology of his cognitive impairment, and also to discuss potential medical treatment options for his cognitive symptoms." *Id.* at 5, KIGHT000008; *see also id.* at KIGHT000220. He also recommended that Mr. Kight "devote increased attention to lifestyle factors for brain health[.]" *Id.* at 5.

### B. Dr. Angela Ashley's Evaluation

Following Dr. King's recommendation that Mr. Kight undergo an evaluation with a neurologist, Mr. Kight was evaluated by Dr. Angela Ashley.[3] Ex. A at 6.

[3] As Dr. Ashley's curriculum vitae reflects (Ex. A at KIGHT000221-30), she received her B.S. from Mercer University in 1989, and her M.D. from Mercer University School of Medicine in 1993. She then completed an internship in the Department of Medicine at Georgia Baptist Medical Center from 1993-94. Afterwards, she completed her residency in the Department of Psychiatry at Emory University School of Medicine from 1994-95. She then completed a fellowship in the Department of Neurology at Emory University School of Medicine (1995-96), and a second residency in the Department of Neurology at Emory (1996-98). She then served as the Chief Resident in the Department of Neurology at Emory (1998-99). Dr. Ashley has been board certified in neurology since 2000. She presently serves on the Behavioral Neurology Section of the American Academy of Neurology, as well as the Education Committee at the Emory University School of

Dr. Ashley is an Assistant Professor in the Department of Neurology at Emory University School of Medicine, and also the Director of the Memory Assessment Clinic at Grady Memorial Hospital. *Id.* As part of Dr. Ashley's evaluation Mr. Kight submitted to an MRI exam. *Id.* Dr. Ashley's report of examination, and Mr. Kight's 2016 and 2008 MRI results, are included in Ex. A at KIGHT000231-45.

Dr. Ashley will testify that she examined Mr. Kight on August 9 and November 15, 2016. Ex. A at 6. As her report reflects (KIGHT000231-38), she conducted a physical examination of Mr. Kight, and discussed his symptoms and history with him and Mrs. Kight. Ex. A at 6. She also reviewed the medical records from his 2008 hematoma, including his 2008 MRI, as well as the test results from Dr. King's neuropsychological evaluation. *Id.* Following those evaluations and reviews, Dr. Ashley directed Mr. Kight to not manage financial affairs without supervision. *Id.* at 6, KIGHT000233. She also directed Mr. Kight to receive an MRI. *Id.*

On August 18, 2016 Mr. Kight received an MRI at Piedmont Hospital. *Id.* at 6, KIGHT000240-41. As Dr. Ashley will explain, Mr. Kight's MRI reflects the

---

Medicine, Department of Neurology. Dr. Ashley does not testify as a retained expert witness, but only when necessary as a treating physician. Mr. Kight has not retained Dr. Ashley in this case, but rather, was evaluated by her solely in her capacity as a treating physician.

damage his January 2008 hematoma inflicted on his brain. *Id.* at 6, KIGHT000237-38. In particular, the large black "hole" (encephalomalacia) in the top right quadrant of the film reflects the hematoma's effects in the area of Mr. Kight's brain that affects judgment, memory, motivation, and personality. *Id.* at 6, KIGHT000239. Dr. Ashley will explain that because Mr. Kight's hematoma was so large, it caused an extremely large volume of brain tissue to be lost as a result of the swelling of his brain and the subsequent death of brain cells. *Id.* at 6. Because Mr. Kight has lost so many brain cells that contribute to brain function, his memory has been adversely affected, and will not improve with age and time. *Id.*

Dr. Ashley met with Mr. Kight again on November 15, 2016. *Id.* at 7, KIGHT000234-38. She diagnosed him with vascular dementia stemming from the hematoma he suffered in 2008. *Id.* at 7. Dr. Ashley prescribed Aricept, a drug that can sometimes boost memory function in certain individuals. *Id.* at 7, KIGHT000238.

**C. Mr. Kight's Second Hematoma, Seizure, and Aphasia**

As Exhibit B reflects, on December 22, Mr. Kight fell while walking his dog. The fall caused 3 broken ribs and a second hematoma. *Id.* Then, on February 6, 2017, Mr. Kight suffered a seizure. *See* Exhibits C and D. He has also been suffering from aphasia. *See* Exhibit D.

On February 15, 2017, Mr. Kight was evaluated by Dr. Maria Silva, a neurologist, following his seizure. *Id*. Following her evaluation, Dr. Silva referred Mr. Kight to a memory clinic for treatment of his cognitive deficits. *Id*. Mr. Kight is continuing with his neurological care and treatment.

## III. Legal Background

Title 18 U.S.C. § 4241 et. seq. governs the assessment of a defendant's competency in a federal criminal proceeding. Section 4241(d) provides that the Court shall find the defendant to be incompetent "[i]f, after the [competency] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense[.]" As the Supreme Court held in *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam), the standard asks "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him."

Defendant respectfully submits that in light of his dementia, aphasia, and cognitive decline, a more than adequate factual record has already been developed

to meet the Supreme Court's test. However, Defendant does not object if the Court wishes to order a medical examination of Mr. Kight pursuant to 18 U.S.C. §4241(b). Following that examination, Defendant respectfully requests that the Court conduct a competency hearing pursuant to 18 U.S.C. §4241(a).

Dated: February 23, 2017

Respectfully submitted,

DENTONS US LLP

By: /s/ Barry J. Armstrong
One of the Attorneys for Defendant

Rachel M. Cannon
ARDC No. 6257028
233 South Wacker Drive
Suite 5900
Chicago, Illinois 60606
Telephone: (312)876-2474
Email: rachel.cannon@dentons.com

Barry J. Armstrong
Georgia Bar No. 022055
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308-3265
Telephone: (404)527-4372
Email: barry.armstrong@dentons.com

**LOCAL RULE 5.1 CERTIFICATION**

I hereby certify that this document has been prepared in Times New Roman 14-point font in accordance with Local Rule 5.1.

Dated: February 23, 2017

Respectfully submitted,

/s/ Barry J. Armstrong
One of the Attorneys for Defendant

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on February 23, 2017 he caused a true and correct copy of the foregoing ***Defendant's Motion to Stay Proceedings to Determine Competency*** to be served upon all parties by electronically filing same with the Pacer/ECF system.

/s/ Barry J. Armstrong_____
One of the Attorneys for Defendant